Terri M. SLATTERY, Plaintiff,

v.

**HCA WESLEY REHABILITATION HOSPITAL, INC., Defendant.**

No. 98–1197–JTM.

United States District Court,
D. Kansas.

Jan. 11, 2000.

Paul S. McCausland, Young, Bogle, McCausland, Wells & Blanchard, Wichita, KS, for plaintiff.

J. Philip Davidson, Deena M. Hyson-Glenn, Wallace, Saunders, Austin, Brown & Enochs, Chartered, Wichita, KS, Jerry C. Newsome, Thomas E. O'Connor, Jr., L. Traywick Duffie, Hunton & Williamns, Atlanta, GA, for defendant.

## MEMORANDUM ORDER

MARTEN, District Judge.

The defendant in this employment discrimination action, HCA Wesley Rehabilitation Hospital, has moved for summary judgment. Plaintiff Terri M. Slattery has filed a response. The court has reviewed the pleadings and is prepared to rule. For the reasons stated herein, the court finds that defendant's motion must be granted.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### Findings of Fact

■ The evidence before the court permits the following findings of fact. At the outset, however, the court must note a consistent problem with the plaintiff's response, namely the reliance not on any objective facts, but simply on her personal feelings about the case. Thus, the response is replete with "facts" set forth by the plaintiff that she "felt" compelled to work; that she "felt" afraid to record all her alleged overtime hours; that she ultimately "felt compelled to resign." In each case, the response wholly fails to describe any objective actions by the hospital which encouraged such fears or feelings. Unsubstantiated, subjective personal opinions are an insufficient basis for opposing a motion for summary judgment. *Phillips v. Calhoun,* 956 F.2d 949, 951 (10th Cir.1992).

HealthSouth operates Wesley Rehabilitation Hospital, Inc., an acute rehabilitation hospital and skilled nursing facility in Wichita, Kansas, where its primary business function is to rehabilitate patients. HealthSouth purchased the hospital in November 1997 from Horizon Healthcare. Before that, the hospital had been owned and operated by Continental Medical Systems ("CMS").

CMS hired plaintiff Terri Slattery as its Admissions Coordinator on or about June 13, 1994. She remained in that position until on or about February 5, 1996, when she became the Admissions Coordinator/Marketing Secretary. Slattery left the hospital when she submitted a "NOTICE OF VOLUNTARY RESIGNATION" form on February 6, 1998. (Def.Exh.D). The resignation became effective on March 6, 1998.

Slattery admits that while employed as Admissions Coordinator from June 13, 1994 to February 5, 1996, she was properly classified as an exempt employee pursuant to the Fair Labor Standards Act ("FLSA") and, therefore, was not entitled to overtime pay. She became a non-exempt employee (entitling her to be paid one and one-half her regular rate of pay for overtime under the FLSA) on or about February 6, 1996, when she became the Admissions Coordinator/Marketing Secretary. At that time, Slattery was informed that she would be eligible for overtime compensation, and she in fact began receiving overtime compensation.

HealthSouth's predecessor, CMS, hired Mary Heaton as its Director of Human Resources in March 1995. As Director of Human Resources, Heaton was responsible for all human resources functions, including compliance with all legislative wage and hour laws and regulations. Heaton has significant education and experience regarding implementing and complying with the FLSA. Indeed, she keeps a copy of the FLSA and its regulations in her office, and subscribes to various government publications to keep track of

FLSA developments. Likewise, Slattery has admitted that the hospital strictly adheres to the FLSA and its policies regarding exempt and non-exempt classifications.

Although the hospital's policy mandates that employees receive permission before they work overtime, occasionally employees have worked overtime without permission. Nevertheless, as required by the FLSA, the hospital compensates all non-exempt employees who work overtime at one and one-half their regular rate of pay for all hours worked in excess of 40 per week.

In September 1997, the hospital implemented a computerized "Kronos" timekeeping system which automatically records all of the hours worked by each employee, including overtime hours. Prior to that time, employees were responsible for manually recording their hours worked on payroll time sheets. Prior to the Kronos system, to be paid overtime, an employee only needed to list the regular hours and overtime hours worked on the time sheet for any given two-week period. After the Kronos system went into effect, the employees "clocked in and out" by swiping their employee identification cards through the computerized timekeeping system.

Slattery has admitted that the hospital is extremely conscious of the overtime requirement as mandated by the FLSA. Indeed, on one occasion, the hospital discovered that some employees were performing duties after normal business hours, but were not recording those hours. When Heaton discovered what was happening, she immediately rectified the situation, compensated the employees for their hours worked, and held management and employee training sessions regarding the hospital's overtime policy.

On one occasion, Slattery asked whether she could work hours "off the clock" in order to complete her assignments. Slattery has admitted that both managers Tennyson and Doyle told her that working off the clock was strictly prohibited and was grounds for discipline.

Indeed, the hospital's policies state that falsification of time records is a terminable offense.

Before the hospital implemented the Kronos timekeeping system (which automatically keeps track of employees' hours worked), Slattery and all other employees were responsible for manually recording their hours worked on payroll time sheets. Slattery admits she was compensated for all overtime hours that she recorded on these time sheets, and for all hours recorded pursuant to the Kronos timekeeping system.

Other than Slattery's time sheets—which she recorded—Slattery kept no other records showing how many hours she allegedly worked. Indeed, Slattery kept no personal records of her time.

In the present action, Slattery alleges that during the time she was a non-exempt employee she worked many hours "off the clock." She further alleges that she informed her superiors that it was difficult to complete her work in an eight-hour day.

However, Slattery admitted in her deposition that she never advised the hospital that she performed work off the clock and never recorded those hours on her time sheet. When asked during her deposition why she did not record all of her alleged overtime hours, Slattery responded "I don't know why I did that." She admits that the hospital never instructed her not to record all overtime hours worked. She admits that she never told any of the hospital's managerial or supervisory personnel that she allegedly worked hours in addition to those she listed on her time records. Indeed, when asked how anyone in management could have known of the alleged overtime, Slattery responded "I don't know." (Slattery dep. at 284).

Although Slattery alleges that she was present at the hospital's facility after normal working hours, Slattery admits that she often performed personal projects during these times. Moreover, the hospital's representatives, some of whom performed

Slattery's position previously, believed that her job duties could easily be completed in eight hours. Nevertheless, the hospital recognized that, on occasion, Slattery's job did require minimal overtime. The hospital paid Slattery for every hour she recorded.

In her resignation notice, Slattery alleged for the first time that she believed the hospital engaged in "inappropriate wage and hour practices." Since Slattery had never brought this issue to Heaton's attention previously, Heaton was alarmed at the notation and immediately questioned Slattery about this issue. Slattery admits that she refused to talk with Heaton about the overtime issue. Heaton told Slattery that she wanted to conduct an investigation of the claim and could not do so unless Slattery provided specifics regarding her complaint. Indeed, Heaton asked Slattery repeatedly to provide her with details of her allegation, and even told Slattery that if the hospital was wrong, it would compensate her for all overtime pay due. (*Id.* at 40).

Slattery admits, however, that she failed to provide any evidence to substantiate her broad allegation of inappropriate practices. Rather, on her last meeting with Heaton, Slattery only asked "would we just settle." (Heaton dep. at 53). Heaton told Slattery that she could not evaluate Slattery's offer to "settle" without any facts to support the overtime claim.

Slattery, who is white, has lived with her boyfriend Darryl Simmons, an African–American, since 1983. In the present action, Slattery alleges that her supervisor, Tennyson, created a hostile work environment which ultimately forced her to resign. (Slattery's Dep. at 123–24). Slattery bases her claim of a hostile work environment on Tennyson's alleged reaction to her boyfriend's race, yet she has admitted that she and Tennyson never even discussed Slattery's relationship with her boyfriend. Slattery admits she never heard Tennyson use any racial epithet.

Slattery acknowledges that she had a very good relationship with Tennyson, even after Tennyson became her supervisor. Indeed, she admitted in her deposition that Tennyson provided her an opportunity to prove herself, even when Tennyson was aware that Slattery's boyfriend was African–American. In fact, Tennyson knew that Slattery's boyfriend was African–American when she was first hired in November 1996.

Slattery also testified that she never felt like she had to keep secret her relationship with her boyfriend, and in fact posted several pictures of her boyfriend, among other family pictures, at her desk.

Tennyson herself is married to a racial minority (a Native American), and Slattery was aware of that fact. Slattery's boyfriend and Tennyson's husband even played volleyball together at the company picnic.

Slattery has admitted to a history of getting along with her superiors at first, followed by a deterioration in the relationship. She admits that none of these superiors, whom she had difficulty working with, harbored any racial animus.

Slattery had a very good relationship with Heaton throughout her employment. Although Slattery received a written warning in October 1997, upon reflection, she agrees that the warning was not related to her association with her boyfriend. Slattery admits she was never discriminated against with respect to pay or performance evaluations. (Slattery Dep. at 93). She also explicitly admits in her deposition that no adverse employment action at all was taken against her because of her association with her boyfriend.

Asked in her deposition about the basis for her belief that she was subjected to a hostile work environment because of her boyfriend's race, (Slattery Dep. at 123–24) the plaintiff cited the following facts:

1) the hospital's employees' work loads increased because of institutional downsizing and Slattery received no sympathy from Tennyson;

2) there were no "ebbs" in the work flow;

3) Slattery did not like the way Tennyson talked to her, and Tennyson made her feel "dumb as dirt" (Slattery dep. at 130–31);

4) Tennyson "misinterpreted" Slattery, and on one occasion confronted Slattery regarding an admissions error. Rather than discussing the situation, Slattery simply stormed out of the admissions area and proceeded to the restroom. Tennyson advised Slattery that she did not appreciate her storming out of the room while they were discussing an admissions issue;

5) Tennyson used the phrase "whoop ass" at work, although she never directed that phrase to Slattery;

6) Tennyson instructed plaintiff to "just do your job," and not concern herself with revising admissions forms or attempting to streamline the admissions process (Id. at 169–70);

7) Tennyson "rolled her eyes" on one occasion (Id. at 171–72);

8) on occasion, Tennyson "ignored" Slattery (Id. at 172);

9) Slattery "felt backed into a corner" and sensed "hostility" (Id. at 140, 142); and,

10) Slattery and Tennyson "did not have friendly conversations any more." (Id. at 152).

In late 1997, a former hospital employee, Katherine Breitenbach, told Slattery that Tennyson had made racially derogatory comments; during the previous September, Tennyson allegedly spoke with Breitenbach about errors on Slattery's time card, but stated that she would not dispute the time card, since "we wouldn't want the nigger patrol after us," or words to that effect (Slattery dep. at 95–101); and in the late fall, Breitenbach allegedly saw Tennyson pick up a picture of Slattery and her boyfriend and mumble, "odd couple." (Breitenbach dep. at 31–32)

Another co-worker, Liz Bryant, once told Slattery that she should take down the picture of her boyfriend because the hospital "always found a reason" to get rid of interracial couples. (Slattery dep. at 62). There is no evidence that Bryant's comment is based on any particular foundation. There is no evidence that Slattery felt the need to take down the picture of her boyfriend.

Although Slattery alleges that Tennyson harassed her because of her boyfriend's race, Slattery admits she felt "humiliated" in her work at the hospital well before Tennyson was even hired. Further, she testified that her perceived "hostile environment" pre-dated Tennyson's employment, yet acknowledges that all of her supervisors before Tennyson harbored no racial animus. Slattery contacted an attorney for advice regarding her "hostile" employment environment well before Tennyson became her supervisor.

In December 1997, Slattery met with several management representatives, including Tennyson, in an effort to improve her relationship with Tennyson. Slattery acknowledges that Tennyson expressed some frustration in her relationship with Slattery. According to Slattery, she had a "positive feeling" after that meeting. Slattery, however, never complained, at this meeting or any other time, that she believed her boyfriend's race was an issue in her relationship with Tennyson.

Slattery had no reason to believe that her relationship with Tennyson deteriorated because of her boyfriend's race until late 1997 when Breitenbach informed Slattery of these alleged comments by Tennyson.

It is admitted that the hospital has a well-defined anti-harassment policy and conflict resolution procedure. The hospital's policy is clearly defined in its Employee Handbook, and states that the hospital is committed to a workplace free of harassment. Likewise, the hospital's Employee Handbook sets forth a comprehensive conflict resolution procedure. Indeed, the hospital's conflict resolution policy encourages prompt reporting of all workplace

complaints or concerns to the employee's supervisor or the human resources department.

A predecessor to the hospital's anti-harassment policy was in effect when Slattery was hired. Slattery, during the HealthSouth orientation session in January 1998, underlined portions of the anti-harassment policy pertaining to the conflict resolution procedure. Although Slattery was aware of the hospital's conflict resolution procedure, she failed to bring these allegations to the hospital's attention. Indeed, while Slattery utilized the conflict resolution procedure in an attempt to improve her interpersonal relationship with Tennyson, she never advised the hospital that she believed she was being subjected to a hostile environment because of her boyfriend's race.

Slattery never once complained of racial harassment until she resigned, and even then her resignation notice simply states that she was subjected to a "hostile environment" and is void of any reference to "race" or her boyfriend. Although Heaton asked Slattery to elaborate on her "hostile environment" claim, Slattery admits she repeatedly refused to provide any support for her bald allegation. According to Heaton, the hospital simply had no knowledge of Slattery's hostile environment allegation until she resigned. Indeed, Slattery did not mention "race" as an issue until her attorney sent the hospital a demand letter long after she resigned.

Although Slattery alleges she was constructively discharged, she acknowledges that Tennyson's alleged harassment did not interfere with her work or her ability to perform her job. (Slattery dep. at 152, 171). Moreover, Slattery admits she had no reason to believe that she would be terminated. (Id. at 112). Although Slattery contends her working conditions were so onerous that she was forced to resign, she provided four weeks notice, rather than the two weeks notice suggested by the hospital's Employee Handbook.

### Conclusions of Law

#### 1. FLSA

▮ Slattery has included here a claim for violation of the Fair Labor Standards Act, 29 U.S.C. § 207(a)(1) which requires compensation for overtime worked in excess of 40 hours per week. To support such a claim, the plaintiff must show that she actually worked overtime, that the amount of overtime was shown by justifiable and reasonable inference, and the employer had actual or constructive knowledge of the overtime. The court must conclude that plaintiff's claim fails, however, on the last element. Very simply, there is no evidence Slattery informed the hospital of the alleged overtime, or that the hospital was otherwise aware of it.

In her response to the motion for summary judgment, Slattery contends she was "afraid" to report her overtime, that it was impossible for her to perform her work in an eight-hour day, and that other workers saw her at work after hours. There is, as noted earlier, no evidence of any action taken by the hospital which would have reasonably created such fear.

Slattery's statement that she was "afraid" to report her overtime is belied, moreover, by her admission that on a number of occasions she did report overtime. On each occasion, she received compensation for the reported overtime. While Slattery may have believed personally that she could not have performed her work in an eight-hour day, she specifically admits the hospital managers "believed that Plaintiff's job duties could easily be completed in eight hours." (Def. Uncontr. Fact ¶ 21). And while Slattery's co-workers may have seen her on the premises after hours, Slattery also admits that she frequently performed personal tasks while she was at work after hours. In any event, there is no evidence that any supervisors or managers of the hospital saw Slattery working, or even apparently working, overtime. To the contrary, Slattery specifically admits she never told any

manager she was working overtime. Asked how the hospital could have known she was allegedly working overtime, Slattery conceded she did not know how the hospital could have known. She further admits she was specifically told not to work overtime.

■ Of course, an employer cannot defend an action for overtime benefits under FLSA on the grounds that it prohibited employees from working overtime, if there is evidence that the employer was nonetheless aware that employees actually worked more than 40 hours per week. *See Riley v. Town of Basin,* 961 F.2d 220 (10th Cir. 1992); *Wirtz v. Bledsoe,* 365 F.2d 277, 278 (10th Cir.1966). Here, however, there is no such evidence that the hospital was aware of the alleged overtime. Rather, the evidence of the instruction not to work overtime is accompanied by the plaintiff's admissions that (1) she never told the hospital's management of the overtime, (2) that hospital's managers believed she could perform her work in an eight-hour day, (3) that in her after-hours time she often performed personal tasks, and (4) she has no basis for knowing why the management would know of the alleged overtime.

## 2. Racial Harassment

The court must also dismiss plaintiff's claim of racial harassment. While Slattery makes a number of complaints about her treatment by Tennyson, as noted earlier, only three of the twelve complaints involve any real connection to potential racial harassment. These are (1) comments by Tennyson that she needed to "take out a can of whoop ass;" (2) two comments reported to Slattery by Breitenbach in late 1997 that (a) "we wouldn't want the nigger patrol after us," or words to that effect, and (b) Tennyson referred to Slattery and her boyfriend as an "odd couple;" and (3) Liz Bryant's comment to Slattery that she

should take down the picture of her boyfriend because the hospital "always found a reason" to get rid of interracial couples.

There is no indication that the term "whoop ass" was used with any racial connotation. It is uncontroverted that Tennyson did not use the term around Slattery. Conversely, there is evidence that Tennyson did use the term about other, white employees, who did not consider the term racially offensive. Bryant's comment hasn't been connected to any behavior by Tennyson, or indeed to any specific foundation whatsoever. It appears to be simply Bryant's personal opinion. Nor is there any evidence that Slattery responded to the comment by feeling threatened.

■ The comments made by Tennyson to Breitenbach and then reported to Slattery, are without doubt more serious in nature. But the court cannot find, under all of the circumstances of the case, that they demonstrate a racially hostile work environment.

Breitenbach told Slattery about these two comments in late 1997. It is uncontroverted that Tennyson never used any racial epithet in Slattery's presence. Tennyson and Slattery never talked about Slattery's boyfriend. Slattery admits she had a good relationship with Tennyson in the beginning.[1] Slattery also had a good relationship with Heaton throughout her employment. During the course of that employment, Slattery has conceded that she was never discriminated against with respect to pay or performance. She has admitted that she had no reason to think she would be terminated if she did not resign. Indeed, Slattery gave four weeks notice, twice the length of time suggested in the hospital's Employee Handbook.

During her employment, Slattery met with hospital management to discuss the

---

1. In an attempt to explain these admissions, Slattery suggests in her response that her relationship with Tennyson deteriorated after she posted the picture of her boyfriend in her work area. There is no evidence to support this suggestion, however. More importantly, the suggestion is itself refuted by the evidence—uncontroverted by Slattery—that Tennyson knew of "her and Kenny" at the time Tennyson was first hired. (Def. Uncontr. Fact ¶ 28).

difficulty she had working with Tennyson. She felt "good" after the meeting. However, while she discussed a number of issues during the meeting, she never mentioned (then or at any later time) that she felt Tennyson was biased because of her boyfriend's race.

■ A plaintiff claiming a hostile work environment "must show that a rational jury could find that 'the workplace is permeated with "discriminatory intimidation, ridicule, and insult," that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."'" *Davis v. U.S. Postal Service,* 142 F.3d 1334, 1341 (10th Cir.1998) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986))). In evaluating whether the alleged harassment is sufficiently severe or pervasive, the court must examine the entire case, including the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Trujillo v. University of Colorado Health Sciences Center,* 157 F.3d 1211, 1214 (10th Cir.1998)

Accordingly, the court finds summary judgment is appropriate on the harassment claim on two grounds. First, as repellent as the two alleged comments by Tennyson to Breitenbach are, they reflect a single incident, reported by Breitenbach to Slattery in late 1997. Tennyson never used such language around Slattery, and there is no evidence that Slattery's job was made materially more difficult because of any racially-motivated conduct by Tennyson. *Cf. Witt v. Roadway Exp.,* 136 F.3d 1424, 1428–29 (10th Cir.1998) (two comments by employee's superiors twice referred to him as a "n ___ ___" held under

the facts of the case not to constitute illegal harassment).[2]

Second, the court finds that the case reflects an appropriate application of the affirmative defense articulated recently in *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 2286, 141 L.Ed.2d 662 (1998); and *Burlington Indus. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 2267, 141 L.Ed.2d 633 (1998).

In creating or recognizing this defense, the Court wrote:

An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ.Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the em-

2. *Witt* is not explicit as to the derogatory "n___" word epithet used, "but it is evident from the context that the term was one highly offensive to African–Americans." *Figueroa v. Paychex, Inc.,* No. 99–797–ST, 1999 WL 717349, at *7 n. 2 (D.Or. Sept.7, 1999).

ployer's burden under the second element of the defense. No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

*Faragher,* 118 S.Ct. at 2292–93

Slattery responds to the hospital's assertion of the affirmative defense by arguing alternatively that the defense is not available because she suffered a tangible adverse employment action in that she was constructively discharged, and that the hospital's procedures were inadequate. Both arguments are unsupported in the facts.

 To prevail on a constructive discharge claim, plaintiff must "allege facts sufficient to demonstrate under an objective test that a reasonable person would have viewed her working conditions as intolerable." *Jeffries v. Kansas,* 147 F.3d 1220, 1233 (10th Cir.1998). "Essentially, a plaintiff must show that she had no other choice but to quit." *Sanchez v. Denver Public Sch.,* 164 F.3d 527, 534 (10th Cir. 1998) (quoting *Yearous v. Niobrara County Mem'l Hosp.,* 128 F.3d 1351, 1356 (10th Cir.1997)) (internal quotation marks omitted). The employment conditions must be objectively intolerable; neither the plaintiff's subjective view of the employment environment nor the employer's subjective intent is relevant. *See Sanchez,* 164 F.3d at 534

 There is no evidence to support the suggestion that Slattery was constructively discharged. Slattery has admitted that Tennyson's alleged harassment did not interfere with her work or her ability to perform her job. She has admitted she suffered no discrimination in her pay or her performance. She has admitted she had no reason to believe that she would be terminated if she did not resign. And, in submitting her resignation, Slattery provided four weeks notice, twice the time suggested by the hospital's Employee Handbook.

 Nor is there any basis, the court believes, for finding the hospital's grievance procedures inadequate. Although Slattery asserts she felt intimidated by Tennyson, the fact remains that Slattery could *and in fact did* use the hospital's procedures to discuss her relationship with Tennyson. Slattery used the procedures provided by the hospital's rules, but she used those procedures solely as a vehicle for discussing her difficulty in working with Tennyson generally. She never used those procedures to complain of or even mention any alleged racial harassment by Tennyson; nor has she offered any objectively rational basis for believing such procedures would be ineffective to address complaints of racial harassment.

To the contrary, Slattery specifically admits (see Def. Uncontr. Fact ¶ 41) that the hospital has a well-defined anti-harassment policy and conflict resolution procedure; that the policy commits the hospital to a workplace free of harassment; that the policy provides a comprehensive conflict resolution procedure; and that the policy encourages prompt reporting of all workplace complaints or concerns to the employee's supervisor or the human resources department. It is uncontroverted Slattery was aware of the hospital's conflict resolution procedure. Indeed, while Slattery utilized the conflict resolution procedure in an attempt to improve her interpersonal relationship with Tennyson, she never advised the hospital that she believed she was being subjected to a hostile environment because of her boyfriend's race.